# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1598-23

K.M.B.,

    Plaintiff-Appellant,

v.

T.V.C.,

    Defendant-Respondent.

_____

Submitted March 19, 2025 – Decided May 21, 2025

Before Judges Marczyk and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-0243-24.

Buchan, Palo & Cardamone, LLC, attorneys for appellant (Stephanie Palo, on the brief).

Respondent has not filed a brief.

PER CURIAM

In this appeal, plaintiff K.M.B.[1] appeals from the trial court's November 29, 2023 order denying his request for a final restraining order (FRO) and dismissing the temporary restraining order (TRO) entered against defendant T.V.C. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Following our review of the record and the applicable legal principles, we affirm.

I.

On August 3, 2023, plaintiff was granted a TRO stemming from alleged acts of domestic violence that occurred the prior day. The TRO included the following predicate acts: assault, N.J.S.A. 2C:12-1; criminal coercion, N.J.S.A. 2C:13-5; terroristic threats, N.J.S.A. 2C:12-3(b); sexual assault, N.J.S.A. 2C:14-2; criminal sexual contact, N.J.S.A. 2C:14-3; and harassment, N.J.S.A. 2C:33-4.

After several adjournments, the FRO trial commenced on November 29, 2023. The case was tried in a single day, and the court placed its decision on the record, denying plaintiff's application for an FRO and dismissing the TRO. We glean the following from the trial transcript.

---

[1] We utilize initials to protect the confidentiality of the parties. R. 1:38-3(d)(9).

The court gave opening instructions, noting that the parties had previously been before it, and referenced the specific predicate acts set forth in the complaint. Plaintiff testified he was in a dating relationship with defendant for over six years, thereby establishing jurisdiction. The parties had a tumultuous relationship and had broken up in January earlier that same year.

Plaintiff testified that on August 2, he was staying at a motel in Elizabeth after having been in and out of friends' houses and domestic violence shelters. Defendant did not know where plaintiff was staying, but defendant "catfished"[2] plaintiff through a dating app, and plaintiff invited him to the motel. Plaintiff stated defendant was wearing a mask when he appeared at the door. Plaintiff opened the door, and there was "a little bit of an altercation" once plaintiff recognized it was defendant. Defendant, who was recording the incident on his phone, served plaintiff with legal "papers."

According to plaintiff, defendant subsequently put his phone in his pocket, and plaintiff asked him to leave "[s]everal times." He recalled defendant then pushed him into a chair for approximately ten minutes, despite plaintiff asking him to leave. Plaintiff stated he was naked during this incident and that he attempted to get up from the chair to retrieve his phone to "call the police or to

---

[2] Catfishing is being misled online by someone pretending to be someone else.

A-1598-23

notify someone." He claimed defendant proceeded to try to take his phone away from him, and during the struggle defendant "bashed" plaintiff's head into the wall. He recounted defendant then attempted to strangle him.

Plaintiff asserted that defendant then forced him into the bathroom and tried to kiss him. The parties continued to struggle, and plaintiff testified defendant "body slammed" him. He testified defendant then covered plaintiff's mouth with his hand and proceeded to stick "his finger . . . inside [plaintiff's] rectum." Plaintiff noted he screamed loudly, which he believed scared defendant, who fled from the motel room.

Plaintiff estimated the encounter lasted approximately twenty to twenty-five minutes. He claims defendant wanted him to drop a court case against him involving allegations that defendant illegally locked plaintiff out of the apartment. He testified defendant wanted to evict him from their apartment and said he could have plaintiff killed. During the encounter, plaintiff alleges defendant also called him an "a[**]hole" and "fu[**]head." Plaintiff stated he had "strangulation marks" on his neck, a cut on his chest, bruising on his face, and injuries to his rectum. Plaintiff identified several photos which purportedly

depicted a scratch mark on his neck, eye, and chest from the incident.[3]  Plaintiff testified he was treated at a hospital for his injuries.  He testified he had not seen defendant since May, which was at a prior restraining order hearing.

Plaintiff proceeded to testify about defendant's prior alleged acts of domestic violence.[4]  He claims he injured his knee and had his nose broken in those previous incidents.  He claims he is afraid of defendant as a result of those prior injuries.

On cross-examination, plaintiff maintained that defendant threatened to kill him if he did not end the court case.  He acknowledged that he had not obtained any of the medical records for the treatment he received in this matter.

Defendant had a vastly different version of the encounter at the motel.  He testified he videotaped a portion of the incident.  He stated the video was an accurate depiction of what transpired when he attempted to serve the legal papers on plaintiff.  The video, which was approximately one minute in length,

---

[3]  Plaintiff did not request to enter the photos into evidence.

[4]  After advising the court that he had no further questions, plaintiff's counsel was reminded by the court that he had not addressed any history of domestic violence.  The court encouraged plaintiff to "make [a] record," even though the court had previously presided over a domestic violence case involving the parties.

was then played for the court. In the video, defendant advised plaintiff that he had "been served," and plaintiff responded, "I've been served. . . . Thank you. I am also naked." Defendant testified he did not meet any resistance when plaintiff opened the door.[5]

On cross-examination, defendant acknowledged he used an anonymous profile when contacting plaintiff on a dating app. He further conceded he had a mask on but stated it was "COVID season." He stated plaintiff was surprised when he showed up at the door. Defendant further conceded plaintiff asked him to leave the room. He recounted he advised the police that he put his hands on plaintiff, but it was after plaintiff "put his hands on [him] first." He also testified he restrained plaintiff from hitting him. He acknowledged he advised police, "I messed up. I should have just served him and left." He conceded the video did not show the entire time he was in the motel. He also testified he was arrested after the incident.

On re-direct examination, defendant testified that plaintiff assaulted him first. He testified he had previously tried to serve plaintiff with legal papers to remove plaintiff's name from the lease, but he did not have plaintiff's address. Defendant testified that plaintiff attempted to slap the phone out of his hand

---

[5] Defendant did not request to enter the video into evidence.

when he appeared at the door filming plaintiff. Defendant further recalled that after serving plaintiff with the papers, plaintiff slapped defendant, and the argument got heated. He stated it ended up being a "slight physical altercation," which resulted in him trying to restrain plaintiff from hitting him. He claims it was "more so like a sloppy wrestling match."

Defendant testified that after a couple seconds, he eventually walked out and immediately called the police. He advised the police that he did not want to press charges, but he wanted to document what had occurred, "for the simple fact that in the past when [he] had not called first, [he] ended up getting the short end of the stick later."

On re-cross, defendant acknowledged that the video played for the court did not depict any argument or wrestling match. He acknowledged on questioning from the court that in hindsight it was not a wise thing to have stayed in the motel room after he served the papers.

Defendant's counsel's closing argument focused on the credibility of plaintiff, noting the video did not demonstrate that he resisted the door being opened. Moreover, a struggle did not immediately ensue when defendant entered the motel room according to the video. Defense counsel concluded there

7

was insufficient evidence that a predicate act occurred. Therefore, <u>Silver v. Silver</u>[6] two-pronged test had not been satisfied.

Plaintiff's counsel pointed out that defendant anonymously obtained an invitation to plaintiff's motel room. Moreover, defendant only recorded a portion of the confrontation, and he acknowledged there was a physical altercation. Counsel said it was not recorded because it would have shown the predicate acts of domestic violence, including criminal coercion, terroristic threats, sexual assault, criminal sexual contact, and harassment.

Following summations, the court rendered an oral decision initially noting that plaintiff had the burden of proving by a preponderance of the evidence that defendant committed one of the predicate acts of domestic violence alleged in the complaint. It noted, "[t]he problem that I have with this case is that I have one person's word against the other. And as I've said over and over and over again, one of you is lying, . . . and I don't know who it is."

The court further stated:

> [Plaintiff] would have me believe that [defendant] comes to this motel room. The door is slightly ajar. He opens the door to find out that it's [defendant]. And he wasn't expecting [defendant], he was expecting a sexual encounter through the . . . app . . . . [A]t some point in time, he accepts documents

---

[6] 387 N.J. Super. 112 (App. Div. 2006).

from [defendant]. But he wants me to believe that, then, [defendant] halfway forces his way into the room, and it escalates into this violent confrontation, including the sexual assault and criminal sexual contact. [Defendant] of course, denies all of that.

The court further stated, "[s]o whose version do I believe? That's a difficult finding to make. But I can't issue restraining orders based on stupidity, because I know [defendant] is guilty of that." The court further noted, "[a]t any rate, [plaintiff] would have me believe that all this happened." The court noted that defendant exercised "poor judgment," "[b]ut again, when it's all said and done, I don't have any solid proof as to what happened when you turned your phone off, and you entered th[e] premises." The court further commented, "[i]t is, of course, shocking to believe" plaintiff's "version of what happened."

Importantly, the court noted, "[b]ut again, the bottom line is [plaintiff] has to prove it, and I don't find any proof of any of the predicate offenses. I certainly note that he's claiming that [defendant] sexually assaulted him . . . but it's his word against [defendant's]." The court stated, "I'm not going to just enter a restraining order against [defendant] because he's engaged in extremely poor judgment."

The court went on to admonish defendant for his poor judgment and attempting to serve plaintiff with the legal papers in this manner, noting "it was

9

all stupid."  The court noted, "[b]ut again, . . . [plaintiff] has to meet his burden of proof.  If I had a little bit more evidence, I probably would find in favor of [plaintiff], because I don't think there's any question that there is some history going on between the two of them."

The court further observed defendant had previously represented that the court would not have to worry about him ever coming in contact with plaintiff again.  The court stated defendant was a "liar" because he again appeared before the court.  Nevertheless, the court noted that plaintiff still had to prove his case, and the court did not "find sufficient proof to support [plaintiff's] version of what happened."  It concluded, "I can't enter [an FRO], and I must, therefore, dismiss the [TRO]."

Despite finding no predicate act, the court went on to address prong two of Silver, noting, "I have to find that you're in some immediate danger to person or property."  The court noted, based on its review of the video, it did not find plaintiff appeared to be in any immediate danger from the court's perspective.  The court noted it appeared that plaintiff let defendant in the room, "but it didn't seem as though [plaintiff was] in some kind of immediate fear of . . . defendant."

10

II.

On appeal, plaintiff argues the trial court erred by not making specific findings as to whether he proved the alleged predicate acts as set forth in plaintiff's complaint and thus abused its discretion because he established the alleged predicate acts and the need for an FRO. He further asserts the trial court erred by relying on evidence that was not properly authenticated or moved into evidence. He also claims the trial court erred by making a determination contrary to the comments it made relating to defendant's credibility and that it made improper comments calling into the question the impartiality of the court in rendering its decision.

Our scope of review is limited when considering an FRO issued or denied by the Family Part. See D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). That is because "we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." Ibid. "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Deference is particularly appropriate where the evidence is largely testimonial and hinges upon a court's ability to make

11

assessments of credibility. Id. at 412. We review de novo the court's conclusions of law. S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010).

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125-27. Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6),[7] to protect the victim

---

[7] The six factors are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment[,] and physical abuse; (2) [t]he existence of immediate danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; (4) [t]he best interests of the victim and any child; (5) [i]n determining custody and parenting time the protection of the victim's safety; [and] (6) [t]he existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1)-(6).]

from an immediate danger or to prevent further abuse." Id. at 127; see also N.J.S.A. 2C:25-29(b) ("In proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse."); J.D. v. M.D.F., 207 N.J. 458, 476 (2011).

A.

Plaintiff argues the court did not define the elements of the alleged predicate acts and did not engage in any analysis as to whether plaintiff established his claim by a preponderance of the evidence. He further alleges the court did not make specific findings of credibility, and it appeared "the [c]ourt found plaintiff more credible than . . . defendant," noting the court stated defendant lied to the court. He argues the court failed to make appropriate findings of fact and conclusions of law. Plaintiff further contends the court abused its discretion in not finding in his favor.

Plaintiff's arguments are unpersuasive. Despite characterizing defendant's conduct as "stupid" and using "poor judgment," the court noted it was not persuaded by plaintiff's testimony stating, "[i]t is, of course, shocking to believe that it all happened the way" plaintiff alleged. Moreover, the court held, "the bottom line is [plaintiff] has to prove it, and [the court did not] find any proof of any of the predicate offenses" nor did it "find sufficient proof to support

[plaintiff's] version of what happened." Contrary to plaintiff's arguments, the court made credibility findings and determined plaintiff failed to prove any of the predicate acts by a preponderance of the evidence.

The court's failure to specifically articulate the elements of each predicate offense is not reversible error. The court specifically referenced the predicate acts that were pled. Moreover, a parsing of the individual elements of the offense was not central to the court's decision under these circumstances.

Plaintiff continues to assert defendant "physically attacked, and sexually assaulted him." Defendant testified in stark contrast to plaintiff. The court rejected plaintiff's version of the events. The court found plaintiff failed to marshal sufficient evidence to sustain his burden of proof—a preponderance of the evidence—regarding how the encounter transpired. Given the substantial deference we owe to the trial court's findings of fact, we conclude plaintiff has failed to demonstrate the court erred in reaching its conclusion.[8]

B.

---

[8] Plaintiff further argues that if we conclude he established a predicate act, we should remand for the trial court to properly address the second prong of Silver. Because we determine the court did not err in finding plaintiff failed to prove a predicate act, we need not address the second prong of Silver.

14

Plaintiff asserts the court improperly relied on defendant's video evidence which was never authenticated or moved into evidence. He asserts the court relied on the video in opining that it did not appear that plaintiff was in fear of defendant. He also contends the court erred in reaching its conclusion because it was contrary to the credibility findings it made at trial regarding defendant. Specifically, plaintiff points to the court's colloquy with defendant towards the end of its decision where it called defendant a liar, because the court had previously heard a case involving defendant that was dismissed—where defendant represented to the court it would not have to worry about him appearing in court again. Plaintiff acknowledges these points were not raised before the trial court.

Where a party seeks to raise an issue on appeal not raised below, we review that contention under the plain error standard. R. 2:10-2. Generally, we do not consider issues not raised before the Family Part "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." N.J. Div. of Youth & Fam. Servs. v. B.H., 391 N.J. Super. 322, 343 (App. Div. 2007) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). "[A]n appellate court will not reverse an error not brought to the attention of the trial court unless the appellant shows . . . it was 'plain error,'

15

that is, 'error clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2).

Initially, we observe that the trial court only addressed the video in the context of the second prong of Silver, which is not germane to our decision, given that we have concluded the court did not err in finding plaintiff failed to establish a predicate act under the first prong of Silver. Moreover, plaintiff never objected or raised any challenge to the court considering the video presented by defendant. Indeed, plaintiff cross-examined defendant regarding the fact that he did not capture the entire incident on video. Furthermore, contrary to plaintiff's assertions, defendant did authenticate the video.

Although the video and the photos of plaintiff's alleged injuries were marked as exhibits, they were never formally entered into evidence. However, neither party seemed to recognize what appears to have been a procedural oversight, and the record demonstrates the parties intended to rely on the exhibits. This omission does not rise to reversible plain error.

We next turn to the court's reference to defendant as a liar after finding plaintiff failed to prove his case by a preponderance of the evidence. The court appeared to be voicing frustration at seeing defendant again, despite defendant's previously advising the court it would not see him again. Of course, defendant

16

has no control over being required to appear in court when named in a PDVA complaint. Despite the court's dissatisfaction and frustration with defendant, it separately made appropriate findings of fact concluding plaintiff failed to meet his burden to obtain an FRO. The court's ruling on the merits is the issue before this court, and the trial court's admonition to defendant does not impact our decision. That does not, however, end our inquiry.

We observe the court went on to advise defendant, "[a]nd if you come back again . . . , then I am going to enter [an FRO]. There's no doubt in my mind I'll prejudge the case, I'll tell you that. I'm not supposed to say that . . . . But lie to me twice, you're done." These intemperate remarks were improper. Given the court's comments that it could not fairly deal with defendant in any future matters, we direct that the judge involved here refrain from hearing any further cases involving defendant.

C.

Plaintiff next argues the court's comments during the hearing could lead a reasonable observer to doubt the court's impartiality. When plaintiff's counsel raised concerns about the defense video being shown in open court, the court noted that plaintiff had testified that defendant "stuck [a] finger up his anus. So I don't know why he would be shy now."

A-1598-23

The court explained its experience in criminal cases essentially finding that unfortunately unpleasant evidence is often presented to the court. He commented, "I can't help [having the video played in court.] Listen, I did criminal for many years, and I had rape cases, and they had to be very explicit . . . . I have seen some very . . . bad photos." Although the court should have approached this issue more thoughtfully, we do not find this stray comment called into question his ability to impartially decide the case. Moreover, immediately after the court's remark, the attorneys arranged, with the court's approval, that the video would be facing away from the gallery thereby protecting plaintiff's privacy, and there was no further discussion of the issue. In short, we discern no basis to disturb the court's findings.

To the extent we have not addressed any of plaintiff's other arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

18                                                                                    A-1598-23