# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1355-20

T.D.,[1]

     Plaintiff-Respondent,

v.

M.A.,

     Defendant-Appellant.

_____

Argued December 7, 2021 – Decided December 23, 2021

Before Judges Accurso and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-3093-20.

Daniel J. Welsh argued the cause for appellant.

Philip A. Ross argued the cause for respondent.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the victim, R. 1:38-3(c)(12), and pseudonyms for ease of reference.

Defendant M.A. appeals from a December 10, 2020 final restraining order (FRO) issued in favor of his ex-girlfriend, plaintiff T.D., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  A Family Part judge entered the FRO after finding defendant committed the predicate act of harassment, N.J.S.A. 2C:33-4(a), and N.J.S.A. 2C:25-19(a)(13), and an FRO was necessary to protect plaintiff from defendant's further abuse. Defendant claims errors in the trial judge's evidentiary rulings, credibility assessments, and factual findings warrant reversal of the FRO.  Having considered defendant's contentions in view of the record and the governing law, we disagree and affirm.

I.

The facts were established at the one-day bench trial, during which both parties were represented by counsel.  Plaintiff testified and introduced in evidence still images from videos of herself masturbating she had texted to defendant while he was incarcerated.  Defendant did not testify, but presented the testimony of plaintiff's former best friend, S.H. (Sally), and introduced in evidence email exchanges between the parties after their relationship ended, purportedly expressing her consent to share those images.

According to the undisputed trial record, the parties began dating shortly after meeting at a motorcycle club in April 2015. A few months later, in August or September 2015, defendant was incarcerated on state and federal charges. The parties maintained their relationship during defendant's three-year prison term. Defendant called collect two to three times per day; plaintiff visited defendant "at least once a month."

The genesis of the incident that precipitated the filing of the present domestic violence complaint arose when defendant was incarcerated at Fort Dix. Sometime in 2017, defendant obtained a cellphone, and the parties began "sexting" and exchanging "cybersex" videos. Plaintiff explained:

> I used to send [defendant] pornographic videos [of myself]. I wasn't comfortable with it at first, but he reassured me that it was okay. I felt comfortable sending them to him. I didn't think they would ever get out. I would send him videos and he would send me videos of himself, you know, doing sexual acts to himself. And we would, you know, text each other and keep on that phone while he was in jail, like late night hours. So that went on for like a whole year.

In August or September 2018, defendant was released on parole to plaintiff's home, but the parties' relationship was short-lived. Defendant's adjustment to freedom was difficult. Plaintiff testified that defendant "was very unhappy" because he could not resume his pre-incarceration way of life.

A-1355-20

Defendant was "mean" and "chauvinistic" and told plaintiff: "Women should be seen and not heard." Believing defendant's negative comments, plaintiff felt she was not "worthy enough for a man."

Plaintiff soon discovered defendant was cheating on her with multiple women. Plaintiff said defendant blamed her for his actions, claiming he cheated because plaintiff "[did]n't know how to talk to men." On October 31, 2018, following another argument caused by defendant's ongoing cheating, defendant left the house with packed bags. Plaintiff followed defendant to the parking lot and stood in front of his van, attempting to speak with him. Defendant "slammed the gas" and almost struck plaintiff, but she "jumped out of the way."

Defendant returned to plaintiff's home, but his cheating continued. Ultimately, the parties' relationship ended when plaintiff once again confronted defendant about his infidelity. The parties were last intimate in November 2018.

Sometime thereafter, defendant blocked plaintiff from his social media and cellphone. But plaintiff appeared at his home on three occasions, seeking reimbursement of money she had loaned defendant. At the end of December 2018, plaintiff emailed defendant, pleading with him to take her back. Notably, plaintiff claimed she was "ashamed of [her]self" for "behav[ing] like a child"

4

and graphically described several sadomasochistic acts she was willing to perform to assuage defendant.

Plaintiff acknowledged that after the breakup she completed an eight-month counseling program to address her "unhealthy" attachment to defendant. In August or September 2019, plaintiff began a relationship with A.C. (Arthur). That relationship soured, however, in April 2020 when Arthur accused plaintiff of attempting to rekindle her relationship with defendant. Plaintiff claimed defendant sent Arthur the compromising videos she had sent defendant when he was incarcerated.

Because Arthur did not testify at trial, the judge sustained defendant's hearsay objection as to "any communication or conversations" between plaintiff and Arthur. Over defendant's objection, the judge admitted in evidence the photographic stills from the videos, finding they were properly authenticated. Plaintiff confirmed she had not "shared those videos and photographs with anyone" other than defendant; she sent those images to defendant while they "were sexting" when he was incarcerated; and the photographs made from the videos were not "modified in any way."

Plaintiff further testified that on April 21, 2020, the day after defendant was arrested and served with plaintiff's April 19, 2020 temporary restraining

order (TRO),[2] "he posted to his Facebook account that he walked out of the cell with his head up.  And that after two years, you still want this cheese doodle."  Plaintiff told the judge defendant was "referring to his penis."  The post continued:  "Go in the bathroom, open the cabinet, and take the pills."

Acknowledging defendant had blocked plaintiff from all social media, plaintiff explained that the parties had mutual friends who forwarded a "screenshot" of defendant's Facebook page.  Plaintiff believed defendant's post was directed at her because, after their relationship ended, she told defendant she was depressed and wanted to commit suicide.  In her December 30, 2018 email to defendant, plaintiff stated she had taken "sleeping pills, Benadryl, and Tylenol PM" and was "mad as hell" when she woke up alive.

On May 19, 2020, plaintiff amended her complaint, asserting a domestic violence history that included defendant's attempt to strike her with his van, and the April 21, 2020 Facebook post.  Plaintiff also generally alleged defendant verbally abused her "on several occasions" by calling her certain derogatory names and telling her to commit suicide by taking pills.

---

[2]  The parties stipulated that defendant was arrested by the East Orange Police Department on April 20, 2020 and served with the TRO.  He was released from jail the following day.

A-1355-20

Sally testified she knew plaintiff from their motorcycle club. Sometime in 2016 or 2017, Sally "saw in the [club]'s group chat pictures and videos of [plaintiff] having sex and also other things." Sally stated "about eighty members" comprised the group chat. Plaintiff testified she "never sent any sexual videos to other people," but a previous boyfriend had attempted to film their sexual encounter when she was a member of the bike club. That boyfriend ceased filming when plaintiff protested.

Following summations, the trial judge rendered an oral decision and issued the FRO under review. Citing the harassment statute, the judge concluded defendant's "communication [of plaintiff's compromising images] to a third-party with the intent that it would be brought to the attention of . . . plaintiff clearly [wa]s harassing in nature."

Crediting plaintiff's testimony, the judge determined plaintiff intended to share her "compromising" images only with defendant and that she was "confronted with" the images by "a party outside their relationship." The judge was persuaded that plaintiff established the images were "from the 2017 point in time when she was sharing intimate videos and communications with [defendant]." Because "[t]he communication was of such a nature that it showed the intimate parts of . . . plaintiff's body that [were] shared with another," the

7

judge was satisfied plaintiff demonstrated the communication "ha[d] no legitimate purpose other than to cause annoyance or alarm to [her]."

The trial judge found defendant harassed plaintiff by "mak[ing] or caus[ing] to be made a communication in offensively coarse language or in other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(a).[3] In reaching his decision, the judge found Sally credible because she testified about "compromising photos" that plaintiff "had previously shared" with the motorcycle club. However, the judge found Sally's testimony was "not relevant to the proceeding here."

Addressing whether plaintiff established the need for an FRO, the judge specifically acknowledged the prior domestic violence history between the parties and concluded restraints were necessary to protect plaintiff from further abuse. Accordingly, the judge granted the FRO.

## II.

Our limited scope of review of a trial court's findings is well established. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e grant substantial

---

[3] Under N.J.S.A. 2C:33-4(a), a person is guilty of harassment "if, with purpose to harass another," the person "[m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm."

deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will not disturb the court's factual findings and legal conclusions "unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (internal quotation marks omitted).

Deference is particularly appropriate here, where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Ibid. It is axiomatic that the judge who observes the witnesses and hears the testimony has a perspective the reviewing court simply does not enjoy. See Pascale v. Pascale, 113 N.J. 20, 33 (1988). We also accord deference to the factual findings of Family Part judges because that court has "special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413. Conversely, a trial judge's decision on a purely legal issue is subject to de novo review on appeal. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007).

The entry of an FRO under the PDVA requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence,

that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011) (noting the importance of the second Silver prong). Of particular relevance to this appeal, these factors include, but are not limited to: "The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse." N.J.S.A. 2C:25-29(a)(1).

In the present matter, defendant challenges the trial judge's findings under both Silver prongs. Defendant raises three arguments as to prong one, contending the trial judge: (1) erroneously considered plaintiff's compromising images, which were embedded in text messages the judge had excluded as inadmissible hearsay; (2) inconsistently found credible the testimony of both plaintiff and Sally as to whether plaintiff had shared the compromising images

10 <span>A-1355-20</span>

with other members of the motorcycle club; and (3) disregarded plaintiff's emails by improperly concluding they demonstrated plaintiff suffered from battered women's syndrome. Defendant also asserts the judge's findings as to the second Silver prong "were not supported by competent evidence."

As to defendant's first argument, the parties agree that the trial judge properly excluded the text-message exchanges between plaintiff and Arthur as inadmissible hearsay. See N.J.R.E. 801(c) (defining hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the matter asserted in the statement"). Instead, defendant argues the images embedded in the text-message exchanges constituted hearsay within hearsay. See N.J.R.E. 805. Defendant's argument is misplaced.

Under N.J.R.E. 805: "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." A photograph is included within the definition of a "writing" under N.J.R.E. 801(e), but a "statement" includes a "written assertion" only "if the person intended it as an assertion" under N.J.R.E. 801(a). Because plaintiff did not intend the images to be assertions, they were not statements as

defined in N.J.R.E. 801(a) and, as such, they do not fall within the purview of the hearsay rule.

Moreover, as the trial judge correctly determined, plaintiff authenticated the photographs under N.J.R.E. 901. As such, the images were properly admitted in evidence. In any event, the judge found credible plaintiff's testimony that she had sent the images only to defendant, refuting defendant's assertion that the judge based his decision on inadmissible hearsay evidence. As the judge noted, those images underscored "the nature of the relationship between the parties."

Nor do we find any merit in defendant's second argument, suggesting the judge's credibility findings were inconsistent. Although the judge also found Sally credible, the judge was persuaded that her testimony was not relevant to the present matter. According to the judge, even if plaintiff "had shared compromising photos of herself with . . . the motorcycle club" as Sally testified, the images at issue "were intended to be shared between [the parties] only." The record supports the judge's finding.

For example, at trial, Sally was not asked to identify the images that were admitted in evidence. Nor was Sally asked to describe any details about the "pictures and videos" she "saw in the group chat" that Sally claimed depicted

12

plaintiff "having sex and other things." Indeed, Sally was not questioned as to whether the photos she viewed in "2016 or [20]17" depicted plaintiff masturbating. In sum, Sally did not testify the images she viewed in the group chat were the same images plaintiff sent to defendant while he was incarcerated at Fort Dix. Accordingly, we discern no error in the judge's determination that Sally's testimony, although credible, was irrelevant.

In his final challenge to the judge's findings under the first Silver prong, defendant contends the trial judge mischaracterized the emails plaintiff sent to defendant soon after the parties' relationship ended. Defendant claims the emails conclusively demonstrate plaintiff "expressed her consent to the distribution of her pornographic images as early as December 20[1]8," yet the trial judge improperly concluded the emails demonstrated plaintiff suffered from battered women's syndrome. That conclusion, according to defendant, requires expert testimony.

At issue are the following excerpts from two of plaintiff's emails, all of which essentially implored defendant to rekindle their relationship. In her December 18, 2018 email, plaintiff offered to perform a variety of masochistic acts, and told defendant to "record" and "keep the footage." Plaintiff then stated she would "get on camera and give [her] full consent." In her January 2, 2019

email, plaintiff asked defendant to punish her physically, stating: "And record my consent and my apology. Keep it for your files. Or share it. Do whatever you want. You own me." Notably, defendant did not question plaintiff regarding the parameters of her "consent" expressed in these emails, or whether that consent included the sharing of the specific videos she sent defendant while he was incarcerated.

Generally referencing plaintiff's emails in his decision, the trial judge found her statements "we[re] typical of what a victim of domestic violence would express" by "refer[ring] to herself as subservient" and her "willingness to do whatever it took to demean herself to live up to [defendant]'s expectations." Contrary to defendant's contentions, the judge did not determine plaintiff suffered from battered women's syndrome. The judge's determination that plaintiff was a domestic violence victim finds support in the testimony he deemed credible and his "expertise in family matters." See Cesare, 154 N.J. at 413. The judge's conclusion did not require expert testimony. Accordingly, even if plaintiff's expressions of consent could be imputed to her compromising videos – shared with defendant one year prior to sending these emails – the judge properly discounted those statements.

In essence, having evaluated the testimony of plaintiff and defendant's witness, the trial judge found the competent evidence sufficient to conclude defendant violated N.J.S.A. 2C:33-4(a), by forwarding plaintiff's compromising images to Arthur. See J.D., 207 N.J. at 477 (holding that under subsection (a) of the harassment statute "there need only be proof of a single such communication, as long as [the] defendant's purpose in making it, or causing it to be made by another, was to harass and as long as it was made in a manner likely to cause annoyance or alarm to the intended recipient").

Finally, we are not convinced by defendant's argument that plaintiff failed to demonstrate the need for an FRO. Defendant claims plaintiff "was obsessed with [him]" and he "would have nothing to do with [plaintiff]" if she would leave him alone. Defendant's assertions misapprehend the parties' domestic violence history and the judge's findings concerning the timing of defendant's harassing communications.

Without expressly referencing the factors enumerated in N.J.S.A. 2C:25-29(a), the judge nonetheless determined plaintiff established a prior domestic violence history between the parties. See N.J.S.A. 2C:25-29(a)(1); see also Cesare, 154 N.J. at 401-02 (noting the PDVA does not require incorporation of all factors but does require evaluation of any prior history of domestic violence).

Noting defendant's text messages containing the compromising images were sent nearly two years after the parties' relationship ended, and defendant's remark on Facebook was posted "shortly [after] or upon his release from [jail]," the judge was persuaded that the timing of defendant's communications demonstrated defendant presented "an ongoing threat to the health and safety of . . . plaintiff." We discern no basis to disturb the judge's findings. See D.N., 429 N.J. Super. at 596.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1355-20